UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

HOWARD I. GINSBURG, as Administrator
of the Estate of Bradley Marc Ginsburg,

                         Plaintiff,

     -v-                                              5:11-CV-1374

CITY OF ITHACA and CORNELL
UNIVERSITY,

                         Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                              OF COUNSEL:

MCCALLION & ASSOCIATES, LLP               KENNETH F. MCCALLION, ESQ.
Attorneys for Plaintiff
100 Park Avenue, 16th Floor
New York, NY  10017

OFFICE OF HOWARD I. GINSBURG              HOWARD I. GINSBURG, ESQ.
Attorneys for Plaintiff
21175 Falls Ridge Way
Boca Raton, FL  33428

LAW OFFICES OF THERESA G. PULEO          DAVID TWICHELL, ESQ.
Attorneys for Defendant City of Ithaca
441 South Salina Street
Syracuse, NY  13202

OFFICE OF UNIVERSITY COUNSEL             NELSON E. ROTH, ESQ.
Attorneys for Defendant Cornell University  VALERIE L. DORN, ESQ.
300 CCC Building                          WENDY E. TARLOW, ESQ.
Garden Avenue
Ithaca, NY  14853


DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION and ORDER

## I. INTRODUCTION

On November 21, 2011, plaintiff Howard I. Ginsburg ("plaintiff" or "Ginsburg") filed this action as the administrator of the estate of his deceased son, Bradley Marc Ginsburg ("Bradley"). On December 8, 2011, plaintiff filed an amended complaint in which he asserts fourteen causes of action against the City of Ithaca ("Ithaca"), Cornell University ("Cornell"), and several individuals.[1] On March 15, 2012, a Memorandum–Decision and Order ("MDO") was filed granting in part and denying in part defendants' motions for judgment on the pleadings. Ginsburg v. City of Ithaca, 839 F. Supp. 2d 537 (N.D.N.Y. 2012). This MDO dismissed all claims against the individual defendants as well as the claim for punitive damages.[2] Therefore, the only remaining defendants are Ithaca and Cornell.

In the amended complaint, Ginsburg alleges Cornell's negligence caused Bradley's wrongful death (First, Seventh, Ninth, Eleventh, and Thirteenth Causes of Action) as well as personal injuries and conscious pain and suffering (Second, Eighth, and Tenth Causes of Action). Similarly, he alleges Ithaca's negligence caused Bradley's wrongful death (Third and Fifth Causes of Action) and personal injuries/conscious pain and suffering (Fourth and Sixth Causes of Action).

The parties have completed extensive discovery, and Ithaca and Cornell have each filed a motion for summary judgment. The motions have been fully briefed. Oral argument was heard on March 14, 2014, in Utica, New York. Decision was reserved.

---

[1] Subject matter jurisdiction is based on the complete diversity of the parties. Plaintiff is a Florida resident, and defendants are residents of New York.

[2] Thus, the Twelfth and Fourteenth Causes of Action, which were only asserted against the individual defendants, are no longer part of this action.

## II. <u>FACTUAL BACKGROUND</u>

Unless otherwise noted, the following facts are undisputed.  On February 16 or 17, 2010, Bradley—an eighteen-year-old Cornell freshman—jumped to his death from the Thurston Avenue Bridge into the Fall Creek Gorge near the Cornell campus in Ithaca, New York.[3]  Bradley did not have any history of mental health issues prior to his matriculation at Cornell.  He did not seek any counseling or mental health assistance from any agency affiliated with Cornell or Ithaca.  He spent the 2009 Thanksgiving and Christmas holidays with his parents in Florida and spoke with them frequently on the phone after he returned to Cornell.  Both parents, as well as Bradley's roommate, were unaware of any mental health concerns prior to his death.  Bradley was earning straight-As and was pledging a fraternity when he died.

There are seven bridges over two large gorges on or near the Cornell campus in Ithaca.  Four of the bridges are owned by Cornell, three are owned by Ithaca.  Ithaca owns the Thurston Avenue Bridge, but Cornell owns the property on either side of it.  This particular bridge is highly traveled by Cornell students as it connects the north campus, where freshmen live, to the main academic area of campus.  Bradley crossed this bridge daily.

In the 1990s Ithaca initiated routine repair work on the Thurston Avenue Bridge.  The scope of this project expanded into a major reconstruction.  Ithaca hired LaBella Associates ("LaBella") to engineer and oversee this project.  During the design phase, Ithaca and LaBella took into account numerous factors including industry standards, suicide prevention

---

[3]  Bradley's body was recovered on February 17, 2010, but it is unclear when he jumped from the bridge.  He left a suicide note that was created on February 16.

and deterrence measures, preservation of views from the bridge, aesthetic appearance, requirements imposed by the New York Department of Transportation and the Office of Historic Preservation, and input from Cornell and other area residents. Cornell retained Sasaki Associates ("Sasaki") to study pedestrian, vehicular, and bicycle traffic as well as other campus safety matters in relation to the bridge's rehabilitation and in preparation for an expansion of north campus. Sasaki issued a report in May 2002.

The bridge reconstruction was completed between March 2006 and November 2007. Ithaca, the State of New York, and the federal government paid for the project. The reconstructed bridge includes wider sidewalks, new railings, and bicycle lanes. The railings consist of vertical bars that curve in at the top and measure 1.4 meters (approximately 4.5 feet) high, which is higher than applicable regulations at the time of construction. Plaintiff notes, however, that the effective height of the railings is actually lower than it was before the redesign because there is an eighteen-inch cement footing at the base on which a person can stand.[4] The parties dispute how much influence Cornell had on the design of the reconstructed bridge as well as how much control it exercises over the bridge's operation and maintenance.

According to Cornell, twenty-seven people—including Bradley—committed suicide on or near campus between 1990 and 2010.[5] Approximately one-half of these suicides involved

_____

[4] Susan Matzat, a structural engineer at LaBella, advised that the railing's initial design did not include the concrete footing. However, the New York State Department of Transportation required the "brush curb" to ensure the railing was an appropriate vehicle barrier. Matzat Dep. Tr., ECF No. 71-13, 15–16 (The pagination corresponds to the page numbers as assigned on CM/ECF. This convention will be used throughout the order for citations to exhibits.). The railing that was affixed to the bridge prior to the reconstruction in 2006–2007 did not have a concrete brush curb.

[5] In an article co-authored by four mental health and psychology administrators at Cornell, it was noted that jumping deaths accounted for forty-eight percent (48%) of suicides involving Cornell students in

(continued...)

Cornell students. In the five years preceding Bradley's death only one student committed suicide near a bridge spanning the Fall Creek Gorge. This took place in August 2006 and did not involve the Thurston Avenue Bridge. Prior to Bradley's suicide, the last known incident involving a Cornell student jumping from the Thurston Avenue Bridge occurred on November 28, 1996.[6] During the fall 2009 semester—the semester immediately preceding Bradley's death—three Cornell students committed suicide. Two of those suicides were on or near campus, the third occurred out-of-state. None of those students jumped from a bridge.

Within a month after Bradley's suicide, two more Cornell students jumped to their deaths from area bridges. Specifically, a male student's body was recovered near the Thurston Avenue Bridge on March 11[7] and from under a different bridge on March 12. This brought the total number of student suicides for the 2009–2010 school year to six. On March 26, 2010, at Cornell's request, the Mayor of Ithaca declared a public health emergency and permitted Cornell to install temporary chain-link fences on the Thurston Avenue Bridge to prevent further suicide attempts. This fencing, which was also installed on the other six gorge bridges, was significantly higher than the railings.

Thereafter, Cornell retained an architectural and design firm and eventually replaced the chain-link fencing with permanent netting under all seven gorge bridges. Cornell paid for the installation of the fences and nets, and continues to maintain the nets. There is no

---

[5](...continued)
that twenty-year span. McCallion Affirmation, Ex. C, ECF No. 87-3.

[6] Defendants note that a non-student jumped from the Thurston Avenue Bridge on August 20, 2001.

[7] The medical examiner ruled this death a suicide. However, Lieutenant David Nazer of the Cornell University Police Department claims the location of the body suggests this death was the result of an accidental fall from a hiking trail, not a suicidal jump from the Thurston Avenue Bridge. Nazer Aff., ECF No. 71-21, ¶¶ 6–9.

evidence in the record of any further suicide attempts from the gorge bridges after the installation of the temporary fencing and permanent netting.

## III. DISCUSSION

Ginsburg alleges defendants failed to exercise reasonable care in designing, constructing, and maintaining the Thurston Avenue Bridge—specifically, its lack of adequate "means restrictions"[8] to prevent foreseeable suicide attempts. Cornell argues it is entitled to summary judgment because it did not have a legal duty to prevent Bradley's suicide since it did not own or have control over the bridge.[9] Ithaca asserts that it is entitled to a form of immunity protecting governmental entities from suit over traffic design plans.[10] Finally, Cornell and Ithaca both argue that Bradley's suicide was unforeseeable, and that the bridge was not in a dangerous or defective condition in February 2010.

### A. Motion for Summary Judgment—Legal Standard

Defendants have each moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. The entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is

---

[8] The parties use this term to refer to suicide prevention measures typically employed on bridges (i.e. fences, railings, nets, etc.).

[9] Cornell also argues that Bradley's suicide was an independent, superseding act that cut off any liability. This argument was addressed and rejected in the previous MDO, and it will not be revisited. See Ginsburg, 839 F. Supp. 2d at 542–43.

[10] Ithaca also maintains that the claims for personal injury and conscious pain and suffering are time-barred. Plaintiff does not respond to this argument. New York General Municipal Law § 50-i(1) dictates that any claims for personal injury caused by a city's alleged negligence be filed within one year and ninety days from the incident. Bradley's death occurred on February 17, 2010. This action was filed on November 21, 2011—over one year and nine months later. Thus, the claims against Ithaca for personal injury and conscious pain and suffering (Fourth and Sixth Cause of Action) will be dismissed.

entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing FED. R. CIV. P. 56(c)); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248; see also Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

When summary judgment is sought, the moving party bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the claim. Id. at 250 n.4. The failure to meet this burden warrants denial of the motion. Id. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Id. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. Jeffreys, 426 F.3d at 553. Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted); see also Anderson, 477 U.S. at 250 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

## B. Cornell's Duty

Ginsburg alleges that the duty element of his negligence claims arises from a premise

liability theory.[11]  Cornell claims it neither owns nor controls the Thurston Avenue Bridge and thus cannot be held liable for any harm resulting from negligence related to its condition.

Cornell is correct that "a person who lacks ownership or control of property cannot fairly be held accountable for injuries resulting from a hazard on the property." Galindo v. Town of Clarkstown, 2 N.Y.3d 633, 636 (2004).  Conversely, a party that owns or controls the property "has a duty to exercise reasonable care under the circumstances in maintaining its property in a safe condition." In re Kush v. City of Buffalo, 59 N.Y.2d 26, 29 (1983).

It is undisputed that Ithaca owns the Thurston Avenue Bridge and therefore has a duty to design, construct, and maintain it in a reasonably safe condition.  Whether Cornell shares this duty hinges on whether it has exercised sufficient control over the bridge (i.e. the design, construction, maintenance) to justify holding it liable, with Ithaca, for injuries resulting from a hazard on the bridge.

Cornell provided invaluable assistance and input during the design phase of the bridge reconstruction project.  As an initial matter, Ithaca needed Cornell's cooperation to secure legal access to Cornell's land on either side of the bridge where the abutments are located. Cornell also retained Sasaki to study pedestrian, vehicular, and bicycle traffic and other campus safety matters in relation to the bridge's redesign.  Ithaca City Engineer, William

---

[11]  In the amended complaint, plaintiff also sought to impose liability through a special "in loco parentis" relationship between Bradley and Cornell based on Cornell's allegedly inadequate response to the "cluster" of suicides during the fall 2009 semester (Eleventh and Thirteenth Causes of Action).  This special relationship theory was addressed and rejected in the previous MDO. See Ginsburg, 839 F. Supp. 2d at 543 ("New York has affirmatively rejected the doctrine of in loco parentis at the college level." (internal quotation marks omitted)).  Ginsburg also sought to establish a contractual landlord–tenant relationship between Bradley and Cornell (Ninth and Tenth Causes of Action).  The parties have not specifically addressed this proposed source of a duty, which is rejected sua sponte.  Plaintiff has identified nothing but pamphlets and brochures to establish such a contractual relationship.  Therefore, to the extent they were not specifically dismissed in the March 15, 2012, MDO, the Ninth, Tenth, Eleventh, and Thirteenth Causes of Action will be dismissed.  Thus, plaintiff's negligence claims are based solely on premise liability, specifically with respect to the redesign and construction of the Thurston Avenue Bridge.

Gray, explained that the city considered Cornell's use of the bridge and future development plans for the north campus area near the bridge. He claimed Cornell's input, including the Sasaki report, was needed to ensure the reconstructed bridge could accommodate the expected pedestrian, bicycle, and vehicular traffic as well as the utility lines running under the bridge to campus.[12] The introduction of the Sasaki report notes: "Implementation will require joint actions by the City of Ithaca and Cornell University, given the ownership mix and the significance of the area to both parties." McCallion Affirmation, Ex. T-2, ECF No. 89-3, 4. It further predicts that "[t]he recommendations in this report, which were developed jointly with the city, will be incorporated into the city's study." Id. A rational juror could view this language as evidence of Cornell's understanding that this was a joint endeavor with Ithaca.

Cornell employees participated directly in numerous meetings with representatives from Ithaca, LaBella, and Trowbridge & Wolf, a landscape architecture firm retained by LaBella and Ithaca. This interaction impacted various aspects of the bridge design as well as the written report produced by the engineers and project managers. For example, during a June 2002 meeting, Bill Wendt, Cornell's Director of Transportation, asked LaBella and Trowbridge not to include a discussion of Cornell's planned north campus expansion in their written report. See McCallion Affirmation, Ex. T-10, ECF No. 90-7, 2. Ithaca, LaBella, and Trowbridge held a meeting on July 9, 2002, specifically "to present Cornell University with the design progress" in preparation for an upcoming public meeting. McCallion Affirmation, Ex. T-12, ECF No. 90-9, 1. Minutes from this meeting show: "Approval of the preliminary and

---

[12] Cornell was not the only entity to provide information to Ithaca during the design phase. Gray noted that residents of the nearby Forest Home Community and Cayuga Heights also provided input regarding their use of the bridge. However, plaintiff's expert, Joseph McHugh, suggests that some planning meetings were attended by Ithaca and Cornell representatives only and were closed to the general public. McHugh Aff., ECF No. 89-1, ¶ 26.

final design will be from the City of Ithaca and the New York State DOT.  However, the City would like Cornell University's concurrence with the project elements and direction before making that approval."  Id.

Cornell's input ultimately informed the dimensions and layout of the sidewalks, bicycle lanes, and travel lanes on the redesigned bridge.  However, it is unclear how much influence it had over the design of the railing, which is at the heart of plaintiff's negligence claims.  In February 2006 Cornell's Chief of Police sent an email to Cornell's Project Manager advising: "Obviously I'm not very happy with the low height of the railing nor the design of the arches but I addressed those issues months ago during the preliminary design phase of the project." McCallion Affirmation, Ex. T-30, ECF No. 92-5.  This suggests his concerns regarding the height of the railing did not influence the ultimate design.  However, the railing that was installed on the redesigned bridge was a "special design item" because it was higher than that required by code.  Gray Dep. Tr. 42:12.  Also, the LaBella report references Ithaca's and Cornell's recommendations regarding the height and curvature of the railing.  See McHugh Aff., ECF No. 89-1, ¶ 55.  A jury could reasonably infer from this evidence that the decision to install higher railings was caused, at least in part, by Cornell's safety concerns.

In addition, on February 24, 2006, as construction was about to begin, a "Partnering Agreement" was signed by representatives from Cornell, Ithaca, LaBella, Tompkins County Consolidated Area Transit, and Economy Paving Company.  McCallion Affirmation, Ex. T-23, ECF No. 91-9.  This document reflects the parties' agreement "to work together on the Thurston Avenue Bridge Reconstruction Project."  Id.

Finally, shortly after the third suicide in March 2010, Cornell paid for, installed, and

maintained temporary fencing and permanent netting.[13]  Although, it technically had to obtain authority from Ithaca to do so, this indicates that Cornell has some level of practical control over the bridge.  A rational juror could infer that Cornell could have exercised the same control and influence during the redesign phase preceding the reconstruction in 2006–2007.

In short, an issue of material fact remains for a jury as to whether Cornell exercised sufficient control over the design, construction, and maintenance of the Thurston Avenue Bridge to justify holding it liable, with Ithaca, for injuries caused by alleged hazards on the bridge.

### C.  Scope of the Duty

Ithaca, and perhaps Cornell, had a duty to design and maintain the Thurston Avenue Bridge in a reasonably safe condition.  The scope of that duty is informed by "the likelihood of injury to another from a dangerous condition or instrumentality on the property; the severity of potential injuries; the burden on the landowner to avoid the risk; and the foreseeability of a potential plaintiff's presence on the property."  Kush, 59 N.Y.2d at 30–31.  "[A] landowner may be held liable to a plaintiff for harm suffered—even where the plaintiff engages in a voluntary activity—if the landowner (a) had actual or constructive knowledge that injurious conduct was likely to occur or recur, and (b) fails to control that conduct despite the opportunity to do so."  Lloyd v. Alpha Phi Alpha Fraternity, No. 96-CV-348, 1999 WL 47153, at *4 (N.D.N.Y. Jan. 26, 1999) (Scullin, J.).

Defendants repeatedly point out that Bradley's suicide could not have been predicted.

---

[13]  While evidence of the subsequent repair is inadmissible to prove negligence, it is admissible to show control or maintenance.  See Guimond v. Vill. of Keeseville, 113 A.D.3d 895, 897 (N.Y. App. Div. 3d Dep't 2014) (finding an issue of material fact regarding control of a bridge approach where defendant village repaired the asphalt at its own expense immediately following an accident, but later denied ownership).

It is undisputed that Bradley's particular suicide was unforeseeable.  However, as noted in the previous MDO, the foreseeability of Bradley's particular suicide is irrelevant.  The issue is instead whether a suicide attempt from the Thurston Avenue Bridge was likely to occur and foreseeable.  If so, it must then be determined whether defendants had the opportunity and took reasonable measures to prevent such an impulsive suicide attempt by <u>anyone</u>.

In light of the documented history of suicides on or near Cornell's campus, especially those incidents involving the bridges and gorges, a reasonable juror could conclude that further suicide attempts from the Thurston Avenue Bridge were likely to occur and foreseeable.  Indeed, William Gray noted that this was a specific concern during the design phase of the rehabilitation project.  <u>See</u> Gray Dep. Tr. 47:22–24 ("There was a history of suicides from this location, so we were concerned about anybody who might try and climb the handrail.").  Several other people involved in the redesign of the bridge confirmed that the issue of suicide attempts was discussed, albeit generally, at planning meetings.  This is not surprising since two people, including one Cornell student, had jumped to their deaths from the Thurston Avenue Bridge in 1996 and 2001—not long before the initial planning meetings.

Further, the high volume of student traffic over the bridge (which would increase with the expansion of north campus), the relative vulnerability of college students,[14] the height of the bridge and expanse of the gorge, and the obvious severity of potential injury enhances the duty to design and maintain the bridge in a reasonably safe manner.  The redesign and reconstruction project provided a unique opportunity to implement measures to deter future jumpers.  Studies published well before the reconstruction of the bridge had found that most

---

[14]  Plaintiff has submitted a study that collected data from over 26,000 students at seventy colleges and universities and concluded that eighteen percent (18%) of undergraduate students have seriously contemplated suicide.  McCallion Affirmation, Ex. A, ECF No. 87-1.

people who are restrained from impulsively leaping off bridges do not attempt suicide again. See McCallion Affirmation, Ex. R, ECF No. 88-9, 4 (citing studies from 2005 and 1978).

Therefore, a jury must decide—in light of the allegedly foreseeable risk of future suicide attempts—whether Ithaca, and possibly Cornell, had a duty to design and maintain the Thurston Avenue Bridge in a reasonably safe condition to prevent future suicide attempts.

### D. Immunity

Ithaca asserts that the bridge was redesigned and reconstructed in 2006–2007 after a thorough safety study[15] and in compliance with federal and state standards, thus entitling it to immunity from suit.

"A governmental body may be liable for a traffic planning decision only when its study is plainly inadequate or there is no reasonable basis for its plan." Affleck v. Buckley, 96 N.Y.2d 553, 556 (2001) (internal quotation marks and alteration omitted) (citing Weiss v. Fote, 7 N.Y.2d 579 (1960)). To the extent this form of immunity applies to the facts of this case—and not strictly to cases involving traffic patterns, traffic lights, and roadway design—it does not entitle Ithaca to judgment as a matter of law. At oral argument, Ithaca's counsel implied that since the redesigned bridge met or exceeded applicable codes, it is completely absolved of liability for the alleged failure to adequately consider or implement suicide prevention measures. This mischaracterizes the narrow immunity doctrine. As explained above, the scope of the duty entails designing and maintaining the bridge in a reasonably safe condition given the unique circumstances of this bridge, including the foreseeable risk of

---

[15] It is assumed that the "safety study" upon which Ithaca relies is the written report produced by LaBella.

suicide attempts by climbing over the railing and jumping into the gorge.

Although various people testified that the subject of suicide prevention was generally discussed at design meetings,[16] there is nothing in the record indicating Ithaca performed any pre-construction study of this particular subject. A report authored by LaBella explores different types of railings and discusses their crash test results, aesthetics, compliance with historical requirements, and anchoring systems. It does not discuss the use of railings and/or nets to deter suicide attempts. At oral argument, counsel for Ithaca conceded that *no formal study was ever conducted regarding means restriction on the Thurston Avenue Bridge*.

Susan Matzat, a structural engineer at LaBella, confirmed that the railing which was ultimately installed on the redesigned bridge was a customized railing that required specific approval from the New York Department of Transportation. However, she testified that the reasons for its customization included "the vehicular, the pedestrian and the bicycle safety issues"—not suicide prevention. Matzat Dep. Tr. 37–38. When asked whether any consideration had been given to how high the railing should be to deter a person from jumping, Matzat tacitly conceded there had been none because such was not specifically required by code. See id. 42:15–17. She denied having any discussions related to installing netting on the bridge between 2002 and 2007.

Kathryn Wolf, a landscape architect who worked for a firm retained by LaBella during the design phase, testified that her firm was not asked to consider installing nets under the bridge. Wolf Dep. Tr., ECF No. 71-12, 15–16. Further, according to Ithaca City Engineer

---

[16] It is noted, however, that Minakshi Amundsen, who worked for Cornell's Planning Office and attended various planning meetings in 2002, testified that she could not recall the issue of suicide attempts being specifically discussed at the meetings. Amundsen Dep. Tr., ECF No. 71-11, 18:2–4. She claimed that the planners instead focused on how to design the railing to deter people from climbing on it and accidentally falling over it.

William Gray, no studies were ever conducted to specifically address what height a railing should be to deter suicide attempts. He also reported that although community members had raised the issue of installing fencing and nets on area bridges at public meetings dating back to the 1980s, he "was never directed to do a design study of it." Gray Dep. Tr. 72:11–12.[17]

Therefore, as no formal study of means restriction was ever completed or considered despite the available information and extensive opportunities to do so during the years of the reconstruction project and thereafter, Ithaca is not entitled to immunity.

### E. <u>Unreasonably Dangerous Condition</u>

Finally, defendants argue that the negligence claims must be dismissed because the Thurston Avenue Bridge was not in a dangerous or defective condition in February 2010.

Whether defendants satisfied their duty to design, construct, and maintain the bridge in a reasonably safe condition is a fact-driven determination to be made by a jury. Defendants note that the railings on the reconstructed bridge exceeded the height required by code. However, Ginsburg points out that the effective height of the redesigned railings was actually lower than the pre-renovation height due to the concrete footing. Kathryn Wolf, a landscape architect who worked on the redesign project, opined that the inward curvature of the railing "makes it very difficult to climb." Wolf Dep. Tr. 12:7. Conversely, Joseph McHugh, an experienced engineer retained by plaintiff, claimed the curvature actually makes it easier to scale. McHugh Aff. ¶ 86.

---

[17] In a June 2011 article, Dr. Tim Marchell, an Ithaca native and Director of Mental Health Initiatives at Cornell, reported that a grieving father urged Ithaca and Cornell to install means restrictions on area bridges following his daughter's suicide in 1976. McCallion Affirmation, Ex. D, ECF No. 87-4. He also noted that an Ithaca police officer called for the installation of nets under the gorge bridges in 1994. No action was taken, and nineteen suicidal jumps followed in the subsequent years.

Moreover, defendants had to obtain authorization from the New York Department of Transportation for the customized railing. This provided an opportunity to design a railing tailored to suicide prevention concerns in addition to the traffic, pedestrian, and bicycle safety issues already under consideration. It also served as a chance to install additional means restriction, such as netting under the bridge, to counter the allegedly foreseeable risk of future suicide attempts. As detailed above, however, defendants did not conduct any formal study related to means restriction. In fact, higher fences and netting were not seriously considered or installed until a third student jumped from a gorge bridge in March 2010.

In an article co-authored by four Cornell administrators and published in the spring of 2012, it was noted that the addition of the fences and nets was "essential" and filled "a gap in Cornell's comprehensive suicide prevention approach." McCallion Affirmation, Ex. C. This "gap" had been discussed for decades. As noted above, public conversations regarding fences and netting on the area bridges were conducted in the local media and before the Ithaca Common Council beginning in the mid-1970s.

In short, whether the reconstructed Thurston Avenue Bridge was reasonably safe in light of the allegedly foreseeable risk of future suicide attempts is a factual issue to be determined by the jury.

## IV. **CONCLUSION**

Viewing the evidence in the light most favorable to Ginsburg, there are liability issues of material fact for a jury, including: (1) whether Cornell exercised sufficient control over the design, construction, and maintenance of the Thurston Avenue Bridge to justify holding it liable for injuries caused by a hazard on the bridge; (2) whether a suicide attempt from the bridge was reasonably foreseeable to impose a duty on defendants to take reasonable

measures to prevent such an attempt; and, if so, (3) whether the bridge was in a reasonably safe condition in February 2010.

Therefore, it is

ORDERED that

1. Defendant Cornell University's motion for summary judgment is GRANTED in part and DENIED in part;

2. Defendant City of Ithaca's motion for summary judgment is GRANTED in part and DENIED in part;

3. The negligence claims asserted against the defendant City of Ithaca for personal injury and conscious pain and suffering (Fourth and Sixth Cause of Action) are DISMISSED;

4. The negligence claims asserted against defendant Cornell University based on a special "in loco parentis" and contractual relationship (Ninth, Tenth, Eleventh, and Thirteenth Causes of Action) are DISMISSED;

5. The negligence claims asserted against defendant Cornell University based on premises liability for wrongful death and personal injuries/conscious pain and suffering (First, Second, Seventh, and Eighth Causes of Action) remain for trial; and

6. The negligence claims asserted against the defendant City of Ithaca based on premises liability for wrongful death (Third and Fifth Causes of Action) remain for trial.

IT IS SO ORDERED.

_____
United States District Judge

Dated:  March 24, 2014
        Utica, New York.

- 17 -